FILED
United States Court of Appeals
Tenth Circuit

August 14, 2009

Elisabeth A. Shumaker
Clerk of Court

PUBLISH

UNITED STATES COURT OF APPEALS

TENTH CIRCUIT

---

R.W. BECK, INC., a Colorado
corporation,

        Plaintiff - Appellant,

    v.

E3 CONSULTING, LLC, a Colorado
limited liability company,

        Defendant - Appellee.

No. 08-1344

---

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
(D.C. NO. 1:07-CV-01378-RPM)

---

Natalie Hanlon-Leh (Mary V. Sooter with her on the briefs), of Faegre & Benson
LLP, Denver, Colorado, for Plaintiff - Appellant.

Benjamin B. Lieb (Ian R. Walsworth with him on the brief), of Sheridan Ross
P.C., Denver, Colorado, for Defendant - Appellant.

---

Before **HARTZ**, **HOLLOWAY**, and **McKAY**, Circuit Judges.

---

**HARTZ**, Circuit Judge.

---

    R.W. Beck, Inc., and E3 Consulting, LLC, both provide consulting services

and produce independent-engineer reports used to obtain financing for energy-

related projects. Reports prepared by both Beck and E3 have contained sections entitled "Principal Considerations and Assumptions Used in the Projection of Operating Results." Aplt. App., Vol. I at 21 (report prepared by Beck); *id.* at 25 (report prepared by E3). Beck sued E3 in the United States District Court for the District of Colorado because language in that section of an E3 report repeated verbatim much of the language in that section of earlier Beck reports that Beck had copyrighted. The suit raised a claim for copyright infringement under the federal Copyright Act, *see* 17 U.S.C. § 101 *et seq.*, and three claims under Colorado law: unfair competition, unjust enrichment, and deceptive trade practices.

E3 moved to dismiss the complaint for failure to state a claim. *See* Fed. R. Civ. P. 12(b)(6). Because the motion and Beck's response referred to materials outside the pleadings, the district court treated the motion as one for summary judgment. *See* Fed. R. Civ. P. 12(d). The court then granted summary judgment to E3 on all claims. We have jurisdiction under 28 U.S.C. § 1291.

We affirm the judgment on the unfair-competition and unjust-enrichment claims because they are preempted by the Copyright Act. We affirm the judgment on the deceptive-trade-practices claim because Beck cannot establish that the alleged deceptive practice significantly impacted the public. As for the copyright claim, E3 first defends the favorable summary judgment by arguing on appeal (1)

that most of the language at issue in the copyrighted Beck reports is not protected by copyright law because Beck took it from a third-party report that predated Beck's copyrighted reports; and (2) that even if the language in Beck's copyrighted reports was taken from earlier Beck reports, the language in those earlier reports was not protected because it had not been copyrighted and had entered the public domain. We reject these grounds for affirmance because Beck created genuine disputes of material fact by presenting evidence (1) that Beck did not take the language in its copyrighted reports from the third-party report relied upon by E3; and (2) that the copyrighted reports derived their language from earlier Beck reports and internal documents that were themselves copyrighted by Beck and whose language had not entered the public domain. E3 also defends the copyright summary judgment on the ground that the allegedly copied language cannot be protected by copyright law because it serves functional purposes and copyright protects only expression, not ideas. The district court apparently relied in part on this ground in granting summary judgment, but it did so sua sponte; E3 had not argued the point below. Although E3's argument may be meritorious, we refrain from so deciding on this appeal, believing that Beck should be afforded the opportunity to respond to this argument in district court. We therefore reverse the summary judgment on the copyright claim and remand for further proceedings.

Beck also contends on appeal that the district court erred in denying its motion under Federal Rule of Civil Procedure 56(f) to permit more discovery before acting on E3's summary-judgment motion. But because of the grounds for our disposition of the various claims, we need not address the merits of this issue.

## I.    BACKGROUND

Beck and E3 are competing firms that provide engineering-consulting services in connection with the financing of energy-related projects (such as the construction of facilities that convert solid waste to energy). In the typical course of business, an investment bank may engage Beck or E3 to study a project in need of financing. After "analyzing the associated technical, environmental, regulatory and commercial aspects" of the project, the consulting firm memorializes its findings and conclusions in an independent engineer's report. Aplt. App., Vol. I at 60. That report is included in a prospectus presented to potential investors.

This lawsuit arises out of the creation of one such report by E3 in February 2006. Two months earlier Calyon Corporate and Investment Bank had engaged E3 in connection with the financing of two coal-fired cogeneration plants owned by Windsor Financing, LLC. E3 memorialized its findings and conclusions with respect to the project in an independent engineer's report (the Windsor Report), which was distributed to potential institutional investors.

Beck contends that the section in E3's Windsor Report entitled "Principal Considerations and Assumptions Used in the Projection of Operating Results," *id.* at 25, was copied from similar sections included in Beck reports dating back to 1985. Beck's complaint attached (1) a copy of the relevant section from E3's Windsor Report; (2) certificates of copyright registration for two of its reports—the Independent Engineer's Report for the Sacramento Power Authority Cogeneration Project (the Sacramento Report), and the Independent Engineer's Report for the Orange Cogeneration Limited Partnership Project (the Orange Report); and (3) the section of its Orange Report entitled "Principal Considerations and Assumptions Used in the Projection of Operating Results." *Id.* at 21.

The opening paragraph of the relevant section in E3's Windsor Report states:

> *In the preparation of this Report and the opinions that follow, we have made certain* considerations and *assumptions with respect to conditions* that *may exist or events* that *may occur in the future. While we believe these assumptions to be reasonable for the purpose of this Report, they are dependent upon future events, and actual conditions may differ from those assumed. In addition, we have used and relied upon certain information provided to us by sources which we believe to be reliable.* We believe the use of such information and assumptions is reasonable for the purposes of this Report; h*owever,* actual conditions *may vary due to unanticipated events and circumstances. To the extent that future conditions differ from those assumed herein or* represented *to us by others, the actual results will vary from those forecast. This Report summarizes* the results of *our work* through *the date of* this *Report, thus, changed conditions*

> *occurring or becoming known after such date could affect the material and projections presented.*

*Id*. at 25 (We have emphasized the language that matches language in Beck's Orange Report.). The section then lists considerations and assumptions upon

which E3 based its conclusions.[1]  It is followed by the final

_____

[1] The remainder of the section (again emphasizing the language that matches the Orange Report) states:

The specific assumptions upon which the Base Case and Sensitivity Case Projected Operating Results are discussed in earlier sections of this Report.  *The principal considerations and assumptions* that we *made in developing the Base Case Projected Operating Results and the principal information provided to us by others include the following:*

1.  Our review was performed within our scope of services and in accordance with generally accepted engineering practices and includes such investigations, observations, and analysis as we in our professional capacity deemed necessary for this review.

2.  *As Independent Engineer, we have made no determination as to the validity and enforceability of any contract, agreement, rule or regulation applicable to the Project and its operations.  However, for the purposes of this Report, we have assumed that all such contracts, agreements, rules and regulations will be fully enforceable in accordance with their terms.*  Moreover, it is assumed *that all parties will comply with* and fulfill *the provisions of their respective* contracts and *agreements.*

3.  Cogentrix will continue to maintain the Richmond and Rocky Mount *Projects in accordance with good engineering practice*s, *make all required renewals and replacements in a timely manner, and will not operate the equipment* in a manner which will violate Contractor or vendor warranties or materially reduce the expected useful life of the equipment.

4.  Cogentrix *will employ qualified and competent personnel who will* be trained to *properly operate and maintain the equipment in accordance with the manufacturers* and designer's *recommendations and generally accepted* industry *practice*s.

(continued...)

section of the report, which states E3's conclusions regarding the project.

The opening paragraph of the relevant section in Beck's Orange Report

provides:

> *In the preparation of this Report and the opinions that follow, we have made certain assumptions with respect to conditions* which *may exist or events* which *may occur in the future. While we believe these assumptions to be reasonable for the purpose of this Report, they are dependent upon future events, and actual conditions may differ from those assumed. In addition, we have used and relied upon certain information provided to us by sources which we believe to be reliable. However,* some assumptions *may vary* significantly *due to unanticipated events and circumstances. To the extent that* actual *future conditions differ from those assumed herein or* provided *to us*

---

[1](...continued)

5. As Independent Engineer, we have made no determination as to the economic viability or the financial condition of any of the Project participants. We have not attempted to determine the financial ability of any particular participant to ensure performance or completion or pay liquidated damages.

6. A*ny* presently unforeseen *changes in required licenses, permits and approvals will not require* major capital improvements or significantly *increase* the operating *costs* of the Facilities, other than those already assumed.

7. The amount of the New Senior Debt is assumed to be $268,500,000. The amount of the Sub Debt is assumed to be $52,000,000.

8. Interest rate assumptions.

9. SOx and NOx allowance cost assumptions as projected by Cogentrix.

*Id.* at 25–26.

*by others, the actual results will vary from those forecast. This Report summarizes our work up to the date of the Report. Thus, changed conditions occurring or becoming known after such date could affect the material presented* to the extent of such changes.

*Id.* at 21 (emphasis added). The section proceeds to list considerations and assumptions used by Beck in reaching its conclusions.[2] It is followed

---

[2] The remainder of the section states:

*The principal considerations and assumptions made* by us *in developing the Base Case Projected Operating Results and the principal information provided to us by others include the following:*

1. *As Independent Engineer, we have made no determination as to the validity and enforceability of any contract, agreement, rule, or regulation applicable to the Project and its operations. However, for purposes of this Report, we have assumed that all such contracts, agreements, rules, and regulations will be fully enforceable in accordance with their terms* and *that all parties will comply with the provisions of their respective agreements.*

2. The Operator will operate the Project as currently proposed in the O&M Agreement, with the exception of those items represented to us and stated in this Report.

3. The Operator or its successor will maintain the *Project in accordance with good engineering practice, make all required renewals and replacements in a timely manner, and will not operate the equipment* to cause it to exceed the equipment manufacturers' recommended maximum ratings.

4. The Operator or its successor *will employ qualified and competent personnel who will properly operate and maintain the equipment in accordance with the manufacturers' recommendations and generally accepted* engineering *practice* and will generally operate the Project in a sound and businesslike manner.

(continued...)

-9-

5. Inspections, overhauls, repairs, and modifications are planned for and conducted in accordance with manufacturers' recommendations, and with special regard for the need to monitor certain operating parameters to identify early signs of potential problems (such as GTG failures of a nature experienced by other commercial units).

6. A program for spare engine availability for the LM600 gas turbine-generator will continue to be maintained through means such as a lease engine program, hot-section exchange program, or purchase of spare assets.

7. The proposed restructuring of the electric utility industry will not significantly impact the projected electricity revenues of the Project.

8. All licenses, permits and approvals, and permit modifications necessary to operate the Project have been, or will be, obtained on a timely basis and a*ny changes in required licenses,* or *permits and approvals will not require*d [sic] reduced operation of, or *increase*d *costs* to, the Project.

9. The PPI, GDP-IPD, CPI and general inflation rate used variously to escalate electricity payments, steam payments and operating expenses are assumed to increase at an average annual rate of 3.0 percent.

10. The Project will generate an average net capacity of 103,000 kW. Any available net capacity, beyond the total Committed Capacity of 74,000 kW to FPC plus 23,000 kW to TECO, will be sold to FPC at FPC's As-Available Energy Cost.

11. Steam will be exported from the Project to OCF at an average rate of 42,000 lb/hr and a total of 200,000,000 lb/year. Steam pricing will escalate in accordance with the Thermal Sales Agreement.

12. Natural gas heat input to the Project, which includes an allowance for GTG degradation and daily startup is based on an

(continued...)

by the final section of the report, which, as in the Windsor Report, states Beck's

conclusions regarding the project.

E3 presented evidence, however, that the language in the Sacramento and

Orange reports was not original to Beck. Paul Plath, now the Senior Vice

President of E3, was previously employed by Beck. According to his declaration

in this case, he was involved in the preparation of both the Sacramento and

---

[2](...continued)
average heat rate of 8,062 Btu/kWh (HHV) plus annual auxiliary boiler fuel consumption of 84,000 MMBtu.

13. FPC Firm Energy, FPC As-Available Energy Cost, TECO Avoided Energy Rates, FPC and TECO coal costs and natural gas costs will be as projected by C.C. Pace.

14. The non-fuel O&M expenses (including property taxes, insurance and wheeling fees) will be as estimated by OCLP and the Operator, and will increase thereafter with the general rate of inflation with the exception of property taxes which remain constant.

15. The Project will not install Dual Fuel Capability or Back-up Fuel Storage as contemplated in the FPC PPA.

16. The initial deposit to the Debt Service Reserve Fund will be funded from the proceeds of the Bonds in the amount of $4,496,250 and will earn interest at a rate of 4.50 percent per year, as estimated by Credit Suisse First Boston.

17. The average annual interest rate on the Bonds will be approximately 8.175 percent, as reported by Credit Suisse First Boston. The actual amortization schedule of the Bonds will be as reported by Credit Suisse First Boston.

*Id.* at 21–22 (emphasis added).

Orange reports. In 1994 Beck was hired by the Sacramento Municipal Utility District (SMUD) to be the independent engineer in connection with the financing of two power plants. SMUD and Goldman Sachs, the lead investment bank for the project, had obtained financing for a similar project the year before. Black & Veatch Corporation had been the independent engineer for that project. Plath asserts that a representative of Goldman Sachs gave him a copy of the report that Black & Veatch had prepared and indicated that he wanted Beck to follow its form and content. Plath further asserts that as primary author of two reports prepared in connection with the SMUD project, he "utilized the Black & Veatch Report as a template in preparing the[] reports," *id.* at 123, one of which is the Sacramento Report.

The Black & Veatch Report includes a section entitled "Assumptions," which resembles the comparable section in both the Orange Report and the Windsor Report. *Id.* at 127. The opening paragraph of that section states:

> Black & Veatch has used and relied upon certain information provided by the Owner, the Developer, SMUD, and others in this assessment of the Project. We believe the information provided is true and correct and reasonable for the purposes of this Report. In preparing this Report and the opinions presented herein, Black & Veatch has made certain assumptions with respect to conditions which may exist, or events which may occur in the future. We believe that the use of this information and assumptions is reasonable for purposes of this Report. However, some events may occur or circumstances change, which cannot be foreseen or controlled by Black & Veatch, and which may render our assumptions incorrect. To the extent that actual future conditions differ from those assumed

> herein or provided to Black & Veatch by others, the actual results will differ from those which have been forecast in this Report. This report summarizes Black & Veatch's assessment of the Project as of the date of this Report.

*Id.* As with both the Orange Report and the Windsor Report, the section then lists the considerations and assumptions upon which Black & Veatch's conclusions are based, and the section is followed by the final section of the report, which lists Black & Veatch's conclusions.

Regarding the Orange Report, Plath's declaration states that in 1996 Beck was engaged by CS First Boston to act as the independent engineer in connection with the financing of the Orange Cogeneration Limited Partnership Project. Plath asserts that before leaving Beck in 1997, he was involved in the preparation of the resulting Orange Report. According to Plath, CS First Boston requested that Beck use the Sacramento Report as a template for the Orange Report, and therefore "an electronic version of one of the Sacramento project reports was used as a template for the Orange Report to the extent possible." *Id.* at 124.

Beck disputes Plath's version of events. Kenneth V. Marino, a principal and senior director of Beck, signed a declaration contending that Plath would not have been permitted to copy the Black & Veatch Report when preparing the Sacramento Report. E. Michael Gaines, another Beck senior director, signed a declaration to the same effect. Gaines's declaration states that Beck created an internal training manual in September 1982 (the Manual) "[t]o document the

-13-

legal, risk management and professional practice issues which had been identified and addressed by it in the previous several decades based on its experience from serving as consulting engineer in the financing of municipal electrical facility projects." *Id.*, Vol. II at 324. The Manual sets forth guidelines for Beck employees to follow when performing consulting services and issuing reports. It notes the importance of "collecting all of [Beck's] principal assumptions and considerations in one location for the use by financial analysts," *id.* at 325, and includes a sample introductory paragraph for use in the section on "Considerations and Assumptions." The sample states:

> In the preparation of this report and the opinions that follow, we have made certain assumptions with respect to conditions which may occur in the future. While we believe these assumptions are reasonable for the purpose of this report, they are dependent upon future events and actual conditions may differ from those assumed. In addition, we have used and relied upon certain information provided to us by others. While we believe the sources to be reliable, we have not independently verified the information and offer no assurances with respect thereto. To the extent that actual future conditions differ from those assumed herein or provided to us by others, the actual results will vary from those forecast. The principal considerations and assumptions made by us and the principal information provided to us by others include the following:

*Id.* at 532. The Manual then sets forth several sample considerations and assumptions.

Gaines's declaration further states that in 1994 Beck incorporated this standard language into a document entitled "Standards of the Practice." *Id.* at

-14-

328, 551. The document directs Beck employees to use form language in certain sections of its reports. The sample introduction for the section entitled "Principal Assumptions and Considerations," uses language quite similar to that included in the Manual. *Id.* at 567. Marino asserts that only qualified reviewers would have had the authority to deviate from the standard language and format set forth in Beck's Manual and Standards of the Practice; and because Plath had never achieved the status of qualified reviewer, he would not have been authorized to take language from the Black & Veatch Report.

In addition, Marino asserts that between 1985 and 1997 Beck prepared a number of reports that included standard language set forth in its Manual and Standards of the Practice. He quotes several such reports, which are attached to his declaration, all of which contain a section on principal considerations and assumptions. The attached reports all predate the Black & Veatch Report.

Finally, Beck presented evidence that it had copyrighted and placed copyright notices on these earlier reports. Marino asserts that Beck has copyrighted the expression used in its reports "since the 1980s." *Id.* at 318. Beck's internal Manual, a copy of which is included in the record, displays a copyright notice from 1982. And a guideline in Beck's Standards of the Practice requires that all Beck reports be copyrighted and include a copyright notice. Although Beck's Standards of the Practice was first issued in 1994, after several

of its earlier reports were created, Gaines's declaration states that the document "memorialized . . . Beck's policy and procedure that had been in place since the mid-1980s." *Id.* at 328. E3 presented no evidence that Beck's earlier reports had not been copyrighted or that they did not include copyright notices, although no copyright notice appears on the excerpts in the record from Beck reports that predate the Black & Veatch Report.

## II.   DISCUSSION

"We review the district court's grant of summary judgment *de novo*." *Pignanelli v. Pueblo Sch. Dist. No. 60*, 540 F.3d 1213, 1216 (10th Cir. 2008). "Summary judgment should only be granted where, taking the facts in the light most favorable to the non-moving party, there is no genuine issue of material fact, and the moving party is entitled to judgment as a matter of law." *Id.*; *see* Fed. R. Civ. P. 56(c).

### A.   Copyright Infringement

Beck's primary contention is that a section in E3's Windsor Report entitled "Principal Considerations and Assumptions Used in the Projection of Operating Results," Aplt. App., Vol. I at 25, infringes the copyrights in Beck's Sacramento and Orange reports because its language is substantially similar to language in identically named sections of those reports. To prevail on its copyright-infringement claim Beck must establish (1) that it possesses valid

copyrights in the Sacramento and Orange reports, and (2) that E3 copied protected elements of the reports. *See Country Kids 'N City Slicks, Inc. v. Sheen*, 77 F.3d 1280, 1284 (10th Cir. 1996). This second element involves two distinct inquiries: (1) "whether [E3], as a factual matter, copied [Beck's reports]," and (2) "whether, as a mixed issue of fact and law, those elements that were copied were protected." *Id.* E3 does not dispute that Beck possesses a valid copyright in both reports. Nor does E3 dispute that it copied the reports as a factual matter. E3's sole contention is that Beck's reports are almost entirely unprotected. First, it argues that the reports are unprotected because they were derived from earlier works that had been produced by third parties or that had entered the public domain. Second, it argues that the allegedly copied language in the reports is unprotected because it is merely functional language conveying ideas that can be expressed in only a few ways. We proceed to explain why we reject these arguments.

### 1. Unoriginality and Public Domain

In district court E3's argument focused on the proposition that all but an inconsequential portion of the language in the relevant sections of Beck's Sacramento and Orange reports was not protected by copyright law because it was unoriginal. E3's motion to dismiss asserted that the language relied upon by Beck was taken from the third-party Black & Veatch Report, and was thus not original to Beck. After Beck responded with evidence that it had a policy against

adopting a competitor's language and that the language in the Black & Veatch report had appeared in Beck reports and internal documents that predated the Black & Veatch Report, E3 argued that it would still follow that the language in the Sacramento and Orange reports was unoriginal to those reports and hence not protected. In a footnote in E3's reply brief in support of its motion to dismiss, it asserted that Beck had failed to provide any evidence that the language in its earlier reports and internal documents had not passed into the public domain, noting that material published before February 28, 1989, ordinarily was deemed to be dedicated to the public if it lacked a copyright notice. *See* 17 U.S.C. § 405(a)(2); 2 Melville B. Nimmer & David Nimmer, Nimmer on Copyright §§ 7.01–7.02 (Matthew Bender, rev. ed. 2009). Once the unoriginal or publicly dedicated content was eliminated, E3 argued, any remaining similarity between Beck's Sacramento and Orange reports and E3's Windsor Report was de minimis.

Perhaps E3 could prevail on its unoriginality argument at trial, but it was not entitled to summary judgment on this basis. Although E3 produced evidence that the pertinent language in the Sacramento and Orange reports had been copied by Plath from the third-party Black & Veatch Report and was thus unoriginal to Beck, Beck countered with declarations of two managing employees who asserted that Plath would not have been permitted to copy a third-party report. Moreover, Beck employees authenticated Beck reports and internal documents predating the

-18-

Black & Veatch Report that contained essentially the same pertinent language as the Sacramento and Orange reports. Thus, there is a genuine issue of material fact regarding whether that language in the Sacramento and Orange reports was original to Beck.

As for E3's fallback argument—that even if the disputed language can be traced back to earlier Beck reports and internal documents, the language is not protected because it has entered the public domain—Beck again has some evidence, and the law, on its side. Beck produced evidence that it had copyrighted its earlier reports and internal documents and had affixed copyright notices to them. If that evidence is correct (and we must assume that it is when considering E3's summary-judgment motion), then the earlier language did not enter the public domain. The statutory language on which E3 relies would deprive a work of copyright protection only if it was published before February 28, 1989, *without* a copyright notice. *See* 17 U.S.C. § 405(a)(2); 2 Nimmer on Copyright, supra § 7.14[A][1], at 7-133. And if the same party owns a copyright in both a derivative work—that is "a work based upon one or more preexisting works," 17 U.S.C. § 101—and the underlying work that is incorporated in the derivative work, registration of a copyright in the derivative work is sufficient to permit an infringement action on either the preexisting (unoriginal) material or on any newly contributed material. *See Christopher*

*Phelps & Assoc., LLC v. Galloway*, 492 F.3d 532, 539 (4th Cir. 2007); *Streetwise Maps, Inc v. Vandam, Inc.*, 159 F.3d 739, 747 (2d Cir. 1998) ("[B]ecause [the plaintiff] is the owner of the copyright of both the derivative and pre-existing work, the registration certificate relating to the derivative work in this circumstance will suffice to permit it to maintain an action for infringement based on defendants' infringement of the pre-existing work."); 2 Nimmer on Copyright, *supra* § 7.16[B][2][c], at 7-174–7-175. *But cf. Oravec v. Sunny Isles Luxury Ventures*, LC., 527 F.3d 1218, 1230 (11th Cir. 2008) (Plaintiff claimed that defendants' construction of buildings violated his copyright in a model protected as an "architectural" work. *See* 17 U.S.C. § 102(a)(8). But copyright registration of model was as a "pictorial, graphic, [or] sculptural" work, *id.* § 102(a)(5), and registration did not identify any preexisting "architectural" work, so claim failed.)

Thus, if the language in the relevant sections of the Sacramento and Orange reports originated in Beck's earlier reports and internal documents, Beck's registration of copyrights in the Sacramento and Orange reports would be sufficient to permit an infringement action founded either on the material that had been taken from Beck's earlier reports and internal documents or on any material newly contributed to the Sacramento and Orange reports. Accordingly, we cannot affirm the summary judgment on the copyright claim on the basis of E3's unoriginality and public-domain arguments.

## 2. Protection of Ideas (Functionality and Merger Doctrines)

E3 argues on appeal that Beck's claim must fail because it is an attempt to protect ideas rather than expression. E3 relies on § 102(b) of the Copyright Act, which states: "In no case does copyright protection for an original work of authorship extend to any idea, procedure, process, system, method of operation, concept, principle, or discovery, regardless of the form in which it is described, explained, illustrated, or embodied in such work." E3 contends that Beck cannot protect "[t]he ideas of disclaimer, qualification of assumptions and identification of risk factors" that appear in Beck's reports. Aplee. Br. at 24. Applying the so-called merger doctrine, E3 argues that because these ideas "may only be expressed in a limited number of ways," *id.* at 25, the ideas merge with the manner of expression so that the latter—the actual words used—are not protected by the Copyright Act. Beck's words, says E3, are merely "functional and unprotectable." *Id.* at 22.

We will briefly discuss the legal concepts on which E3 relies. As will be apparent from that discussion, there is considerable force in E3's argument. Nevertheless, we are not persuaded that we should affirm its summary judgment on this ground. In fairness, Beck should have an opportunity to respond further in district court.

We begin with functionality. When a work describes how to perform a task (a function), there is no copyright protection for the knowledge (the useful art) thereby conveyed. *See* Pamela Samuelson, *Why Copyright Law Excludes Systems and Processes From the Scope of its Protection*, 85 Tex. L. Rev. 1921, 1923, 1944–52 (2007) (discussing congressional intent that § 102(b) limit the scope of copyright protection in functional works). For example, using a bookkeeping method described in a text does not infringe the text's copyright. *See Baker v. Selden*, 101 U.S. 99 (1879). "Implicit in *Baker* is a recognition that excluding systems, methods, and useful arts from the scope of copyright's protection not only promotes the ongoing progress of science (that is, knowledge creation and dissemination), but also promotes ongoing innovation and competition in the marketplace." Samuelson, *supra*, at 1934. Protection for progress in the useful arts is through the patent process. *See Baker*, 101 U.S. at 102; Samuelson, *supra*, at 1932. What copyright protects "is the language that an author uses to explain, describe, or express whatever ideas or useful arts she may have discovered or created . . . , along with the artistic way in which an author draws or illustrates those ideas or useful arts . . . ." Samuelson, *supra*, at 1936.

The merger doctrine, however, limits even the protection for specific language. As stated in a leading treatise, when "a given idea is inseparably tied to a particular expression," the convention is that there is "merger" between the

two. 4 Nimmer on Copyright, supra § 13.03[B][3], at 13-86. "In such instances, rigorously protecting the expression would confer a monopoly over the idea itself, in contravention of the statutory command." *Id.* This court has explained:

> The merger doctrine is applied as a prophylactic device to ensure that courts do not unwittingly grant protection to an idea by granting exclusive rights to the only, or one of only a few, means of expressing that idea. If protection were granted to these expressions, it would so increase the cost of creation for others who seek to build on the work that it would impede progress in the arts. Such a result is contrary to the goals of copyright as embedded in the Constitution.

*Gates Rubber Co. v. Bando Chem. Indus., Ltd.*, 9 F.3d 823, 838 (10th Cir. 1993) (citation omitted).

As we understand E3's argument, it is combining the notions of functionality and merger to say (1) that Beck's complaint relates only to an alleged copying of functional elements of its reports—the concepts of "disclaiming liability, qualifying assumptions, and identifying standard risk factors with respect to the reported findings and conclusions," Aplee. Br. at 24, and (2) that there are only so many ways to express a disclaimer of liability, etc.,[3] so that Beck's form of expression is not protected.

---

[3] It may be worth noting that if specific language disclaiming liability has been interpreted by a court, others may wish to use the same language because they can be confident of what the legal consequences would be. A slight change in wording might be interpreted differently.

We note that other circuits have denied protection to similar writings. *See Veeck v. S. Bldg. Code Congress Int'l*, 293 F.3d 791 (5th Cir. 2002) (en banc) (denying copyright protection to local building code); *Morrissey v. Procter & Gamble Co.*, 379 F.2d 675 (1st Cir. 1967) (denying copyright protection to rules in a promotional sweepstakes contest). Nevertheless, we believe the better course is to decline to rule on whether the language in Beck's reports is protected. Although E3 raises the issue in its appellate brief and the district court's ruling devoted a sentence to the issue, *see* Aplt. App., Vol. II at 606 ("Utilitarian statements disclaiming liability, qualifying assumptions, or identifying risk factors in a consulting engineer's report are not protected by copyright."), E3 did not make this argument in district court. Indeed, E3's motion to dismiss contained one footnote expressly stating that it was not relying on any "idea rather than expression" argument. *Id.*, Vol. I at 40–41 n.7. And a second footnote stated that some language in the Beck reports appeared to be "functional" but, for the purposes of its motion, E3 presumed that the language was protected. *Id.* at 41 n.8. Given E3's statements, Beck had no reason to present evidence or argument relevant to this protectability issue in district court. "As a general matter, we do not consider issues that were not raised below." *See Forest Guardians v. U.S. Forest Serv.*, 495 F.3d 1162, 1170 (10th Cir. 2007); *cf.*

-24-

*Hoiles v. Alioto*, 461 F.3d 1224, 1236 (10th Cir. 2006) (court has discretion to affirm on any ground supported by record if doing so is fair to appellant).

## B.     State-Law Causes of Action

Beck also contends that E3's conduct subjects it to liability under three Colorado causes of action:  (1) a common-law claim of unfair competition, (2) a common-law claim of unjust enrichment, and (3) a claim of deceptive trade practices prohibited by the Colorado Consumer Protection Act (CCPA), Colo. Rev. Stat. § 6-1-101, *et seq*.  We affirm the judgment in favor of E3 on these claims.  Beck's unfair-competition and unjust-enrichment claims are preempted by the Copyright Act, and Beck cannot establish an essential element of its deceptive-trade-practices claim.

### 1.     Unfair Competition and Unjust Enrichment

E3 moved to dismiss Beck's unfair-competition and unjust-enrichment claims on the ground that they were preempted by the Copyright Act.  Because E3 provided evidence in support of its motion to dismiss Beck's complaint as a whole, the district court treated all of the motion to dismiss as a motion for summary judgment.  *See* Fed. R. Civ. P. 12(d) (if "matters outside the pleadings are presented to and not excluded by the court, the motion must be treated as one for summary judgment under Rule 56").  But no evidence was necessary to dispose of Beck's two state common-law claims.  Therefore, we will review the

dismissal of those claims as we would review a dismissal for failure to state a claim under Federal Rule of Civil Procedure 12(b)(6). We review such a dismissal de novo. *See Christy Sports, LLC v. Deer Valley Resort Co.*, 555 F.3d 1188, 1191 (10th Cir. 2009). We note that Beck did not seek to amend its complaint in district court.

Section 301 of the Copyright Act describes the extent to which the Act preempts state common-law and statutory causes of action. The pertinent provisions state:

> (a) [A]ll legal or equitable rights that are equivalent to any of the exclusive rights within the general scope of copyright as specified by section 106 in works of authorship that are fixed in a tangible medium of expression and come within the subject matter of copyright as specified by sections 102 and 103, whether . . . published or unpublished, are governed exclusively by this title. [N]o person is entitled to any such right or equivalent right in any such work under the common law or statutes of any State.

> (b) Nothing in this title annuls or limits any rights or remedies under the common law or statutes of any State with respect to—

>> (1) subject matter that does not come within the subject matter of copyright as specified by sections 102 and 103, including works of authorship not fixed in any tangible medium of expression; or

>> . . .

>> (3) activities violating legal or equitable rights that are not equivalent to any of the exclusive rights within the general scope of copyright as specified by section 106.

17 U.S.C. § 301. In short, a state-law claim is preempted if "(1) the work is within the scope of the 'subject matter of copyright' as specified in 17 U.S.C. §§ 102 and 103; and (2) the rights granted under state law are equivalent to any exclusive rights within the scope of federal copyright as set out in 17 U.S.C. § 106." *Gates Rubber Co.*, 9 F.3d at 847 (internal quotation marks omitted).

We do not read E3's brief as contesting the first requirement. In any event, it appears that it is satisfied. Section 102 states that "[c]opyright protection subsists . . . in original . . . literary works . . . ." And Beck's reports are "literary works." *See* 17 U.S.C. § 101 (defining the term *literary works* as "works, other than audiovisual works, expressed in words, . . . regardless of the nature of the material objects . . . in which they are embodied"); 1 Nimmer on Copyright, *supra* § 2.04[A], at 2-43 ("The use of the term 'literary' in this context does not connote any criterion of literary merit or qualitative value." (internal quotation marks omitted)). "Copyrightable material often contains uncopyrightable elements within it, but Section 301 preemption bars state law . . . claims with respect to uncopyrightable as well as copyrightable elements." *Nat'l Basketball Ass'n v. Motorola, Inc.*, 105 F.3d 841, 849 (2d Cir. 1997). As the court explained:

> The fact that portions of [Beck's reports] may consist of uncopyrightable material . . . does not take the work[s] as a whole outside the subject matter protected by the Act. Were this not so, states would be free to expand the perimeters of copyright protection to their own liking, on the theory that preemption would be no bar to state protection of material not meeting federal statutory standards.

-27-

*Id.* (internal quotation marks omitted).

Preemption thus turns on whether the state-law rights asserted by Beck are equivalent to any of the exclusive rights within the general scope of copyright, as specified in 17 U.S.C. § 106. That section grants to the copyright owner the exclusive rights to (1) reproduce the copyrighted work; (2) prepare derivative works; (3) distribute copies of the work; (4) perform the work publicly; and (5) display the work publicly. "When a right defined by state law may be abridged by an act which, in and of itself, would infringe one of the exclusive rights, the state law in question must be deemed preempted." *Ehat v. Tanner*, 780 F.2d 876, 878 (10th Cir. 1986) (internal quotation marks omitted). On the other hand, "when a state law violation is predicated upon an act incorporating elements beyond mere reproduction or the like, the rights involved are not equivalent and preemption will not occur." *Id.* (internal quotation marks omitted).

A comparison of two of our opinions, *Gates Rubber*, 9 F.3d 823, and *Ehat*, 780 F.2d 876, is instructive. In *Gates Rubber* we concluded that the Copyright Act did not preempt the plaintiff's claim for trade-secret misappropriation under Colorado law. 9 F.3d at 848. The elements of the state-law claim were "(i) that [the plaintiff] possessed a valid trade secret, (ii) that the trade secret was disclosed or used without consent, and (iii) that the defendant knew, or should have known, that the trade secret was acquired by improper means." *Id.* at 847.

We held that this third element, proof of a breach of trust or confidence, "qualitatively distinguishe[d] such trade secret causes of action from claims for copyright infringement . . . based solely on copying." *Id.* at 848. *See Briarpatch Ltd., LP v. Phoenix Pictures, Inc.*, 373 F.3d 296, 307 (2d Cir. 2004) (claims requiring a breach of fiduciary duty "add[] an extra element that makes the claims qualitatively different from a claim of copyright infringement").

On the other hand, in *Ehat* we concluded that the plaintiff's unfair-competition and unjust-enrichment claims were both preempted by the Copyright Act. 780 F.2d at 879. The plaintiff's research materials were secretly removed from a colleague's office, copied, and replaced. *See id.* at 877. The defendants, who played no role in the removal, obtained an unauthorized copy of the materials, which included quotations that the plaintiff had recorded from original sources, in addition to his own notes and commentary. *See id.* The defendants blacked out material added by the plaintiff, reprinted the original source material, and sold it to the public. *See id.* The district court concluded that the plaintiff's state-law claims did not fall within the scope of copyright, and thus were not preempted, because they were based on "his right in the notes 'as a physical matter and property.'" *Id.* at 878. We disagreed because "[the plaintiff had] not allege[d] a state law claim of conversion to recover for the physical deprivation of his notes. Instead, he sought to recover for damage flowing from their

reproduction and distribution." *Id.* We saw "no distinction" between the state rights asserted in the plaintiff's complaint "and those exclusive rights encompassed by the federal copyright laws." *Id.*

As in *Ehat*, the state common-law rights asserted by Beck are equivalent to the exclusive rights set forth in § 106 of the Copyright Act. Beck's complaint alleges that "employees who left . . . Beck and went to work at E3 . . . took . . . Beck's copyrighted Reports with them, and made unauthorized copies of some or all of . . . Beck's Reports." Aplt. Appl., Vol. I at 9. It further alleges that E3 "has used and . . . continues to use and distribute, without . . . Beck's permission, reports that E3 substantially copied from . . . Beck's consulting Reports." *Id.* at 10. But these allegations—that E3 reproduced and distributed Beck's reports—assert rights that are equivalent to rights under the Copyright Act. *See* 17 U.S.C. § 106(1) (exclusive right to reproduce copyrighted work); *id.* § 106(3) (exclusive right to distribute copyrighted work).

Beck's common-law unjust-enrichment claim incorporates two additional allegations: (1) that E3 "knowingly passed off text from . . . Beck's proprietary and copyrighted Reports as [its] own text," and (2) that E3 "knowingly made false representations about the source of its reports." Aplt. App., Vol. I at 11. The crux of the allegations is that E3 represented to the public that the reports it distributed were its own when, in fact, they were copies of Beck's reports.

At first glance, these allegations appear to incorporate elements that extend

beyond the scope of copyright—passing off and knowing misrepresentation.

Further analysis, however, reveals that these elements do not convert Beck's

claim to something more than the equivalent of a claim of copyright infringement.

The passing-off allegation does not assist Beck. The Nimmer treatise

explains the distinction between a true "passing off" claim and a preempted

misrepresentation claim:

> If A claims that B is selling B's products and representing to the
> public that they are A's, that is passing off. If, by contrast, B is
> selling B's products and representing to the public that they are B's,
> that is not passing off. A claim that the latter activity is actionable
> because B's product replicates A's, even if denominated "passing
> off," is in fact a disguised copyright infringement claim, and hence
> pre-empted.

1 Nimmer on Copyright, *supra* § 1.01[B][1][e], at 1-36. Beck's claim is not a

true "passing off" claim because Beck is not asserting that E3 was passing off

E3's reports as being Beck's reports. Rather, it is a claim preempted by the

Copyright Act.

As for the claim of *knowing* misrepresentation, the inclusion of a scienter

requirement may appear to add an element to the claim, thereby protecting it from

preemption. *See Gates Rubber*, 9 F.3d at 847 (an otherwise preempted cause of

action was not preempted because it required an additional element). But the

Copyright Act itself takes scienter into account in some circumstances. *See*

-31-

17 U.S.C. § 504(c)(2) (increasing statutory damages for copyright infringement when infringement is *willful)*; *id.* § 506 (providing criminal penalties for *willful* copyright infringement). And permitting states to, in essence, create their own copyright laws so long as the laws have their own peculiar scienter requirements would obviously circumvent, if not undermine, the preemption provision of the Copyright Act. The addition of a scienter element does not change what *acts* are prohibited but "merely narrows the applicability of the statute." *Crow v. Wainwright*, 720 F.2d 1224, 1226 (11th Cir. 1983) (Florida criminal statute is preempted even though it requires scienter); *see* 1 Nimmer on Copyright, *supra* § 1.01[B][1], at 1-11–1-12 ("The fact that the state-created right is either broader or narrower than its federal counterpart will not save it from pre-emption. Thus, the mere fact that a state law requires *scienter* as a condition to liability, whereas the Copyright Act does not, cannot save the state law from pre-emption.").

We conclude that Beck's state common-law claims are preempted. *See Kodadek v. MTV Networks, Inc.*, 152 F.3d 1209, 1212 (9th Cir. 1998) (plaintiff's claim that defendants published and placed on the market products bearing images copyrighted by plaintiff was preempted by Copyright Act despite plaintiff's characterization of claim as "'unfair trade practices and unfair competition'").

On appeal Beck asserts that its unfair-competition and unjust-enrichment claims are not preempted because "E3 misappropriated . . . Beck's methodologies,

techniques, . . . and associated goodwill." Aplt. Br. at 18. But these allegations do not appear in Beck's complaint and therefore cannot be considered in our review of the motion to dismiss. *See Doyle v. Okla. Bar Ass'n*, 998 F.2d 1559, 1566 (10th Cir. 1993) (on appellate review of dismissal of complaint under Fed. R. Civ. P.12(b)(6), court will not consider "allegations newly made . . . on appeal"). Moreover, nothing in Beck's appellate briefs suggests that this alleged misappropriation extended beyond copying Beck's language and distributing E3 reports containing that language. As we understand Beck's briefs, the methodologies and techniques allegedly misappropriated were simply the use of Beck's carefully crafted language in its reports. Such a misappropriation claim would be preempted. *See* 1 Nimmer on Copyright, *supra* § 1.01[B][1][f][iii], at 1-47–1-49; *Warner Bros. v. Am. Broadcasting Co.*, 720 F.2d 231, 247 (2d Cir. 1983) ("[S]tate law claims that rely on the misappropriation branch of unfair competition are preempted.").

## 2. Deceptive Trade Practices

Although our above discussion of preemption of Beck's common-law claims would appear to also dispose of Beck's deceptive-trade-practices claim, which is founded on the same factual allegations as the common-law claims, E3 has not argued preemption of this claim, either in district court or on appeal. We therefore address this claim separately.

-33-

To prove a deceptive-trade-practices claim under the CCPA, a plaintiff must establish:

> (1) that the defendant engaged in an unfair or deceptive trade practice;
> (2) that the challenged practice occurred in the course of defendant's business, vocation, or occupation;
> (3) that it significantly impacts the public as actual or potential consumers of the defendant's goods, services, or property;
> (4) that the plaintiff suffered injury in fact to a legally protected interest; and
> (5) that the challenged practice caused the plaintiff's injury.

*Rhino Linings USA, Inc. v. Rocky Mountain Rhino Lining, Inc.*, 62 P.3d 142, 146–47 (Colo. 2003) (internal quotation marks omitted). To determine whether a challenged practice "significantly impacts the public," Colorado courts consider "(1) the number of consumers directly affected by the challenged practice, (2) the relative sophistication and bargaining power of the consumers affected by the challenged practice, and (3) evidence that the challenged practice has previously impacted other consumers or has the significant potential to do so in the future." *Id.* at 149.

We hold that E3 is entitled to summary judgment because it has not engaged in a deceptive trade practice that significantly impacts the public. To explain this holding, we begin by analyzing the nature of the alleged deceptive practice. Beck does not allege that anything in E3's Windsor Report is false. The only deceptive practice it alleges is that E3 has made itself look better than it

-34-

really is by using Beck's language in the considerations-and-assumptions section of its reports. But so long as the information in E3's reports is accurate, the potential investors in the projects analyzed by the reports cannot be injured by E3's alleged misconduct; the origin of the language in the reports could not be material to them. Thus, the only persons that could be injured by the alleged deceptive practices are those who engage E3 to create consulting-engineer reports. By being misled into thinking that E3 is better than it really is, they may mistakenly decide to retain E3, rather than, say, Beck.

It follows that the persons injured by E3's alleged deceptive practices must be those seeking or arranging financing for projects requiring consulting-engineer reports like those prepared by Beck and E3. We have little doubt that such entities are not the consuming public that the CCPA was designed to protect. In terms of the *Rhino Lining* test for significant public impact, the injured persons are too few in number, too sophisticated, and too armed with bargaining power. *See Rhino Linings*, 62 P.3d at 150 (conduct affected only 3 of 550 dealers worldwide in polyurethane chemical products); *Martinez v. Lewis*, 969 P.2d 213, 222-23 (Colo. 1988) (en banc) (conduct affected only one large, sophisticated insurance provider); *Alpine Bank v. Hubbell*, 555 F.3d 1097 (10th Cir. 2009) (conduct affected only one borrower of large sum to build a house). Indeed, one would have to be quite sophisticated to be misled by E3's alleged deception

because only a rather knowledgeable person would infer from the language allegedly stolen from Beck's reports that E3 does high-quality work. We therefore affirm the district court's summary judgment in favor of E3 on the CCPA claim.

## C.    Rule 56(f) Motion

Beck contends that the district court abused its discretion by denying its Rule 56(f) motion to hold E3's summary-judgment motion in abeyance so that it could conduct discovery. But we have disposed of Beck's two common-law claims on the pleadings; evidence obtained in discovery would therefore be immaterial. *See Wolf v. Nw. Ind. Symphony Soc'y*, 250 F.3d 1136, 1145 (7th Cir. 2001) (plaintiff's argument that district court improperly denied Rule 56(f) motion was moot because even accepting plaintiff's allegations as true, plaintiff had not stated a claim for relief). And none of the requested discovery could affect our analysis of Beck's CCPA claim. There remains the possibility of discovery regarding Beck's copyright-infringement claim, but our remand on that claim means that the issue can be reconsidered by the district court. *Noyes v. Kelly Servs.*, 488 F.3d 1163, 1174 (9th Cir. 2007) ("[A]ppeal of the denial of the Rule 56(f) motion is moot in light of the remand."). Beck is therefore not now entitled to relief even if the district court erred in denying its Rule 56(f) motion.

## III.    CONCLUSION

We AFFIRM the summary judgment for E3 on Beck's unfair-competition, unjust-enrichment, and deceptive-trade-practices claims. We REVERSE the summary judgment for E3 on Beck's copyright-infringement claim and REMAND for further proceedings consistent with this opinion.